## GARNER v. GROGAN.

No. 19013.   Opinion Filed May 14, 1929.

T. G. Cutlip, for plaintiff in error.

Chas. E. Wells, for defendant in error.

BENNETT, C. The parties appear here as in the trial court as plaintiff and defendant.

Plaintiff sued defendant in district court of Pottawatomie county for $400, the amount of a check drawn by defendant on Shawnee National Bank payable to plaintiff and payment whereof was stopped by defendant. The petition is in the usual form. The answer, after general denial, set up that the check sued on was executed for the purpose of carrying out a proposed deal between E. O. and T. A. Beasley, the National Bond & Investment Company, and plaintiff, but that the proposed deal was not consummated, and that defendant's clerk, by error and mistake, sent the check to plaintiff; that no consideration passed and that defendant stopped payment on the check as he had a right to do.

The parties waived a jury and tried the issues to the court, who made certain findings of fact and conclusions of law and rendered judgment for the defendant, and plaintiff appeals.

The evidence discloses that plaintiff, J. D. Garner, under the business title of Garner Motor Company, is located in Wewoka, Okla., and engaged in the sale of Buick automobiles; that defendant is in business at Shawnee selling Hudson and Essex cars. E. O. and T. A. Beasley purchased a Buick roadster from plaintiff and gave a note secured by chattel mortgage on the Buick car. Later the Beasleys sought to exchange with defendant their Buick car for a Hudson coach. Their negotiations resulted in an agreement to exchange, provided the National Bond & Investment Company, which was engaged in handling automobile paper, would agree to accept and carry the balance of the purchase price of the Hudson coach. It was agreed, also, that if the plan succeeded, the defendant was to take care of the note and chattel mortgage given by the Beasleys to plaintiff.

Upon hearing the evidence the court made the following findings of fact and conclusions of law:

"That E. O. Beasley and T. A. Beasley purchased from the J. D. Garner Motor Company of Wewoka, one Buick roadster, and gave as part of the purchase price a note secured by chattel mortgage. Payments were made on this note until the note was reduced to approximately $400. Subsequent

to said time, E. O. Beasley and T. A. Beasley proposed to purchase from the defendant, George Grogan, one Hudson coach and to trade in the Buick roadster. All the papers were made up on this transaction by George Grogan, including a check for $400 payable to plaintiff. These papers were to be held by George Grogan until it should be ascertained whether or not the National Bond & Investment Company would carry the balance due on the purchase price of the Hudson coach. During this time there was some telephone conversation between George Grogan and the Garner Motor Company, the plaintiff herein, as to the conditions of the sale of the Hudson coach. Through an error of the defendant's bookkeeper, the check to the Garner Motor Company was remitted to plaintiff by mail. Upon discovery of this, George Grogan called the Garner Motor Company by phone and advised the plaintiff that he would be compelled to stop payment on the check, and that the plaintiff told defendant in this conversation to hold the Buick roadster for plaintiff, and that the defendant further told plaintiff that the sale of the Hudson coach could not go through because of the Beasley Brothers unsatisfactory rating. The Garner Motor Company deposited the check received from the defendant and attached to this check the note given by E. O. Beasley and T. A. Beasley. The mortgage securing this note had never been placed of record and was destroyed by plaintiff. The check came back to plaintiff unpaid who filed suit on the check.

"The court further finds that, as a matter of fact, immediately after the defendant learned that the sale of the Hudson coach would not be completed, he tendered to plaintiff the Buick roadster left with the defendant by the Beasley Brothers, and that this Buick roadster is still in the possession of the defendant which defendant continues to tender to the plaintiff.

"The court further finds that the Beasley Brothers left the country upon their failure to make said trade, and that at this time their whereabouts are unknown to both plaintiff and defendant.

"Conclusions of Law.

"From the above facts, the court concludes, as a matter of law, that the defendant has a right to stop payment on the check at any time before payment, providing the plaintiff has not altered his position to plaintiff's detriment; that, as a matter of law, plaintiff still has the right to foreclose his mortgage on the Buick roadster even though he has destroyed the chattel mortgage, and that plaintiff has not altered his legal status by reason of receiving said check from defendant.

"The court further finds. as a matter of law, that the defendant, having stopped payment on said check is not liable for the amount thereof, to plaintiff, and that the defendant is entitled to judgment for costs."

The plaintiff complains, and says that the findings of fact are not sustained by the evidence, and that the conclusions of law are erroneous because unsupported by facts. In the second paragraph of his motion for new trial, the plaintiff says:

"The court found, as a fact, that 'these papers were to be held by George Grogan until it should be ascertained whether or not the National Bond & Investment Company would carry the balance due on the purchase price of the Hudson coach,' is not supported by the testimony, in any particular, and no such agreement was entered into by the parties or any one of them, because the trade or exchange was not based or predicated in any manner upon the National Bond & Investment Company, and which finding is wholly and entirely without the testimony and unsupported thereby."

On page 19 of the record, T. W. White, witness for plaintiff, on direct examination, was asked the question:

"Q. Between you and Garner and Grogan? What was the agreement? A. That he would pay the check providing the bonding company accepted the deal he and the Beasley boys were transacting—the only condition was that he would pay the check providing we attached the certificate of title and canceled note to the check, and we did that."

On page 12 of the brief of plaintiff in error, this identical question and answer purport to be quoted, but the words "That he would pay the check providing the bonding company accepted the deal he and the Beasley boys were transacting," and omitted from the answer. This answer is misquoted in such a substantial and material way, as we see it, that one might conclude that the purpose was to mislead the court. but knowing counsel we feel that it must have been inadvertence.

On page 47 of his brief, plaintiff's counsel shows his disregard for the record by saying:

"Who agreed that these papers were to be held by Grogan until the bonding company approved the deal? Certainly not Garner because it was all done and fully consummated before Garner knew anything about the bonding company having anything to do with it, and was not called to his attention prior to December 10th to the 12th, 1926."

The record is again misquoted on page 17 of plaintiff's brief:

"Q. Now, Mr. Grogan, you had this con-

versation with Mrs. Garner; what did she say and what did she say and what did you say? (Objected to, etc.) A. I told Mrs. Garner that the National Bond had withdrawn on me, and I couldn't handle the deal, that my check had been sent through error, and I said I have the car there, and the boys had skipped and I didn't know where they were, and she said hold the Buick car."

The answer to that question on page 44 of the record is:

"A. I told Mrs. Garner that the National Bond had withdrawn on me and couldn't handle the deal, and that my check had been sent out through error **and I would have to turn the check down,** and I said I have the car there and the boys had skipped, and I didn't know where they were, and she said hold the Buick car."

The agreement is reflected in the testimony of defendant as follows:

"Q. Mr. Grogan what business are you engaged in? A. Hudson-Essex dealer in Shawnee. Q. Do you remember having a transaction with the Garner Motor Company in Wewoka, about the time this check was given? A. Yes, sir. Q. You may state who you talked to in this transaction? A. The first—I first talked to Mr. Garner over the telephone. Q. What did you say and what did he say? A. I asked him 'What is your unpaid balance, if any, on the Buick automobile'; and he said that it was something like $425, and I told him that the Beasley Brothers were wanting to trade it in, and he said, 'If you will pay the unpaid balance off, I will let you have it for $400.' Q. Did you have any conversation with regards to placing the Beasley Brothers' credit with a bonding company? * * * A. I told Mr. Garner that if Beasleys' reference checks OK, and the bonding company accepts their notes, that he would pay off the note; of course, it all had to be attached and put in the papers, just like this here. Q. You told Mr. Garner over the telephone what? A. That if the National Bond & Investment Company approved these boys deal and accepted them for credit, that we could handle the deal. * * * Q. What was the next thing done? A. We fixed up the papers on the Beasley Brothers, and sent it to the National Bond for approval. * * * Q. How did you hear from them? (National Bond & Investment Company)? A. By telephone, and then by wire and letter."

There was introduced the following telegram:

"Western Union. Received at 112 N. Bell R103 KM WN 10. By Oklahoma City Okla 148 P Dec 10 1926

"George Grogan, Hudson Co Shawnee Okla

"See letter eighth Beasley deal protect

your draft reports unsatisfactory. National Bond & Investment Co 158P"

There was offered in evidence also a letter from this investment company, which, in substance, indicates that they had investigated the proposed Beasley deal, and that there was something wrong about the statements made by the Beasleys as a basis for credit.

Upon receipt of this information, defendant immediately telephoned plaintiff's company. Mr. Garner's wife answered and said that he was not in, and defendant asked to talk with someone who could talk business and was informed by Mrs. Garner that she could talk business.

"Q. Now, Mr. Grogan, you had this conversation with Mrs. Garner, what did she say and what did you say? * * * A. I told Mrs. Garner that the National Bond had withdrawn on me and couldn't handle the deal and that my check had been sent out through error and I would have to turn the check down and I said I have the car there and the boys had skipped and I didn't know where they were and she said hold the Buick car. * * * Q. You held the car then subject to Mr. Garner's order? A. Yes, sir."

Defendant says that he had plaintiff notified also by letter; that he does not know the whereabouts of the Beasleys.

"Q. When did you receive the letter with reference to the date of the telegram? A. The letter must have followed the next day as usual. * * * Q. At the time you had this conversation with her (Mrs. Garner), did she say she was there representing the plaintiff in this transaction? A. I never questioned her. Q. And you at that time don't know that she was acting for the plaintiff? A. I gathered from her conversation over the telephone. Q. From your own knowledge for whom was she acting? A. From my own knowledge at the time I was in the Garner Motor Company office at Wewoka, it seems that she was. * * * Q. Did you ever see the check while it was in the bank there? A. The check I gave? Q. Yes, sir. A. The check was attached to this deal here and sent out through error by my bookkeeper. Q. Did you ever see this check at the bank? A. No, sir. Q. How, under what circumstances did you direct the bank to hold it, payment stopped? A. I authorized them to do it. Q. What date did you authorize that they do that? A. I don't remember about the same date I got the wire from the National Bonding Company. * * * The Court. Did you see the check and the note and stuff when it was presented to the bank? A. No, sir."

From this testimony it appears clear that the consummation of the deal depended upon the acceptance of the security by the bond

company, and that this was known to plaintiff, as shown by his evidence, as well as that of defendant.

"When an obligation to pay money is dependent on the action of a third person over whom neither party has any control, payment cannot be exacted unless the specified act is performed." Gordon v. Pollock, 124 Okla. 64, 253 Pac. 1021.

In Beams v. Young et al., 92 Okla. 294, 222 Pac. 952, the court, in discussing a contract containing a provision requiring a departmental oil lease to be approved by the Secretary of the Interior, quotes with approval two decisions as follows:

"'A claim dependent upon a future contingency—on the happening of an event which may never happen—does not accrue until the event happens; until then it is not a claim.' Farris v. Stoutz, 78 Ala. 130. 'A promise to pay which is conditioned on the performance of an act, or depends on the happening of a contingency, cannot be enforced, unless the condition has been performed or the contingency has happened.' Bollings v. Denver Club, 43 Colo. 345, 96 Pac. 188, 18 L. R. A. (N. S.) 733."

In Gordon v. Pollock, supra, the sale of the lease depended upon the approval of the lease by the Secretary of the Interior, which was not secured, and the court says that by failure to secure such approval title to the interest in the lease did not pass nor did the plaintiff become entitled to the money, even though the money had been in bank.

In the case at bar the defendant owed plaintiff nothing, but simply agreed to pay the Beasley note, provided the bonding company should accept the security on the Hudson coach, which they refused to do, so that, in no event did the defendant ever become liable to plaintiff. The defendant pleaded, and offered evidence tending to prove, that the check on which plaintiff sued was sent out without defendant's knowledge or consent and by error of his bookkeeper. It is clear that the bond company turned down the offered security, and that defendant immediately took the necessary steps to notify plaintiff of the same and also to notify him that the check sued on had been sent out by error and that payment thereon would be stopped, and that the defendant would hold the Buick car for plaintiff's order. so that plaintiff would not be put to any loss. What more should the law require than defendant actually performed? It is quite true that the letter addressed to plaintiff containing the check did not set out the terms or conditions of the arrangement, but was simply a transmittal of the check in payment of the Beasley note

and asking its cancellation, but it must not be overlooked that the proof showed this letter was written without the knowledge or consent of defendant, and was sent out by mistake by the clerk, and the evidence on that score is uncontradicted. No right can grow out of a clear error or mistake in favor of one who knows the facts and who has parted with nothing of value. It is true the proof shows that plaintiff canceled the note, but he did that upon the faith in the check which went to him through mistake. It is idle for plaintiff to argue that the note was paid by such check or that the plaintiff's chattel mortgage became ineffective, by such cancellation of the note or by the destruction of the mortgage. Plaintiff has the same right of action on his note and mortgage that he had before. The Beasleys have not paid their obligation and defendant has not paid it for them.

Plaintiff argues that he sold the check to the bank and lost ownership of and control over it. and cites cases supporting the theory that the bank, as purchaser, could recover from the defendant. That is not the case here. The bank accepted the check for collection and plaintiff and the bank have so dealt with it; otherwise plaintiff would have no right to bring this suit.

The contest is between the original parties. We have gone carefully over the findings of fact and conclusions of law and the supporting evidence, and while the findings of fact are sharply criticised by plaintiff, we think such criticism is unwarranted and arises largely out of the plaintiff's misunderstanding of the facts proved, and the proper inferences to be drawn therefrom. In one instance he claims that there was no ground for the court's holding that the papers were to be retained until the bond company should make its decision. We think no other inference could logically be drawn from the evidence.

Plaintiff complains that the court allowed the defendant to testify as to certain communications had with plaintiff's wife. The ruling of the court thereon would not justify a reversal of this cause, for, if the check were remitted to the plaintiff by mistake and error. defendant had a right to stop payment thereon. and if he acted with reasonable promptness in notifying the plaintiff as to the facts, his action could be subject to no criticism. The communication with the wife who stayed part of the time in plaintiff's place of business and answered the phone seems to have been only for the purpose of giving plaintiff notice at the earliest mo-

ment possible that the bond company had refused credit, and that the check had been sent out by error, and that payment thereof would be stopped. The admission of this evidence under the circumstances perhaps might be defended, but it is not necessary for us to pass upon the question, for the evidence may be treated as immaterial.

From our study of the record and evidence, we are of the opinion that the findings of the court are properly supported, and that his conclusion of law is correct, and for which reasons the judgment of the trial court is affirmed.

DIFFENDAFFER, JEFFREY, HERR, and HALL, Commissioners, concur.

By the Court: It is so ordered.